# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

Wisconsin Voters Alliance, David Tarczon, Elizabeth Clemens-Tarczon, Jonathan Hunt, Paula Perez, Maria Eck, Douglas Doeran, Navin Jarugumilli,

Case No. _____

Plaintiffs,

vs.

**Complaint for Declaratory and Injunctive Relief**

City of Racine, City of Milwaukee, City of Kenosha, City of Green Bay, City of Madison,

**Jury Trial Demanded**

Defendants.

---

The Plaintiffs make the following allegations for their complaint.

## Introduction

Wisconsin Voters Alliance and its member-plaintiffs bring this lawsuit against the Cities of Milwaukee, Madison, Kenosha, Racine and Green Bay because federal law preempts private federal election grants to cities. The Center for Tech and Civic Life (CTCL) has distributed private federal election grants, totaling $6,324,527, to the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison. But, HAVA left discretion to the "states," not the cities, on how to implement federal elections:

> The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.[1]

Federal election law defines the word "state":

---

[1] 52 U.S.C. § 21085, Pub. L. 107–252, title III, § 305 (Oct. 29, 2002), 116 Stat. 1714.

In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.[2]

So, under federal election law, the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison are not "states." Accordingly, they have no legal authority to accept and use private federal election grants.

The following federal law and state law preempt the Wisconsin cities from accepting and using private federal election grants: U.S. Constitution's Elections Clause and Supremacy Clause, National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501-20511, Help America Vote Act, 52 USC §§ 20901-21145, and Wisconsin Statutes § 12.11 prohibiting election bribery. Because of the preemptive effects of these laws, the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison have acted ultra vires, without legal authority, to accept and use CTCL's private federal election grants.

The Plaintiffs are entitled to prospective declaratory and injunctive relief.

### Jurisdiction and Venue

1.      Plaintiffs invoke this Court's jurisdiction under 28 U.S.C. § 1331, authorizing federal-question jurisdiction, for Supremacy Clause claims. *The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

2.      Plaintiffs invoke this Court's jurisdiction under the private cause of action provided under HAVA, 52 U.S.C. § 21112, because the State of Wisconsin has failed to provide the federally-required "appropriate remedy" of a timely, pre-election injunction for

---

[2] 52 USC § 21141.

any person complaining against a Wisconsin local government accepting and using federally-prohibited private federal election grants.

3.     Venue is proper in this Court under 28 U.S.C. § 1391 because the Defendants are Wisconsin municipalities, with offices within Wisconsin, and because the events or omissions giving rise to the claims presented occurred within Wisconsin.

## Parties

4.     Wisconsin Voters Alliance is a Wisconsin non-profit corporation.  The Wisconsin Voters Alliance is an organization with members who seek to ensure, as part of their association objectives, public confidence in the integrity of Wisconsin's elections, in election results and election systems, processes, procedures, and enforcement, and that public officials act in accordance with the law in exercising their obligations to the people of the State of Wisconsin. The Wisconsin Voters Alliance also works to protect the rights of its members whenever laws, statutes, rules, regulations, or government actions that threaten or impede implied or expressed rights or privileges afforded to them under our constitutions or laws or both. Its membership includes candidates seeking elective offices.  The Wisconsin Voters Alliance has many members including the individual plaintiffs.

5.     Plaintiff David Tarczon is an eligible Wisconsin voter residing in the City of Racine.

6.     Plaintiff Elizabeth Clemens-Tarczon is an eligible Wisconsin voter residing in the City of Racine.

7.     Plaintiff Jonathan Hunt is an eligible Wisconsin voter residing in the City of Milwaukee.

8.     Plaintiff Paula Perez is an eligible Wisconsin voter residing in the City of Kenosha.

9.     Plaintiff Maria Eck is an eligible Wisconsin voter residing in the City of Green Bay.

10.    Plaintiff Douglas Doeran an eligible Wisconsin voter residing in the City of Green Bay.

11.    Plaintiff Navin Jarugumilli is an eligible Wisconsin voter residing in the City of Madison.

12.    Defendant City of Racine is a Wisconsin local government.

13.    Defendant City of Milwaukee is a Wisconsin local government.

14.    Defendant City of Kenosha is a Wisconsin local government.

15.    Defendant City of Green Bay is a Wisconsin local government.

16.    Defendant City of Madison is a Wisconsin local government.

## Standing

17.    The Supremacy Clause confers a private cause of action and legal standing on voters in federal elections to sue state and local governments based on election policies and customs which violate federal election law. *The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

18.     HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing on plaintiffs because they fit in the statutory category of "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)."

4

19.     As to plaintiffs' prospective remedies sought in this Court, HAVA, 52 U.S.C. § 21112, titled "Establishment of State-based administrative complaint procedures to remedy grievances" guarantees an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)" of HAVA.

20.     Under section (a) of 52 U.S.C. § 21112, Wisconsin, having received federal HAVA payments, is "required to establish and maintain State-based administrative complaint procedures which meet the requirements of paragraph (2)." Paragraph (2), among other things, requires that Wisconsin provide that:

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the appropriate remedy.

(Emphasis added.)

21.     However, in this case, Wisconsin Statutes § 5.061 has failed to provide the federally-required "appropriate remedy" to "any person who believes that there is… [a HAVA] violation which has occurred, is occurring, or is about to occur" because there is effectively no pre-election injunctive relief allowed under Wisconsin Statutes § 5.061

22.     Wisconsin Statutes § 5.061 is the proverbial "slow boat to China" and does not provide the immediate injunctive relief required to stop the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison from accepting and using CTCL's private federal election grants before the November 3, 2020 election.

23.     Wisconsin Statutes § 5.07, instead, authorizes the Wisconsin Attorney General to pursue injunctive relief for HAVA violations.

5

24.     Wisconsin Statutes § 5.07 is legally insufficient to satisfy the federal "appropriate remedy" requirement for "any person" filing a HAVA complaint in Wisconsin to obtain pre-election injunctive relief.

25.     Because Wisconsin Statutes § 5.061 does not provide the federally-required appropriate remedy under 52 U.S. Code § 21112, plaintiffs have a private cause of action and legal standing under 52 U.S.C. § 21112 to pursue prospective declaratory and injunctive relief in federal court.

26.     An actual controversy exists between the parties, Wisconsin Voters Alliance and the individual plaintiff have suffered an injury-in-fact that is directly traceable to the defendants. 28 U.S.C. § 2201.

27.     The plaintiffs are injured by CTCL's private federal elections grants to the Wisconsin cities, totaling $6,324,527, in violation of federal law which ensure legally-authorized, uniform and fair federal elections.

28.     A government's election policy favoring demographic groups is an equivalent injury to disfavoring demographic groups. "Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

29.     CTCL's private federal election grants to the Wisconsin cities tortiously interfere with plaintiffs' legal rights with respect to their respective cities under federal law to legally-authorized, uniform and fair federal elections. *See The League of Women Voters v. Blackwell,* 340 F.Supp.2d 823 (N.D. Ohio 2004).

6

30.    The injury to the plaintiffs is real and concrete.

31.    This Court's favorable decision will redress the plaintiffs' injuries and allow them to enjoy their rights to legally-authorized, uniform and fair federal elections guaranteed under federal law.

## Statement of Facts

32.    The Cities of Racine, Kenosha, Green Bay and Madison are all first class cities and incorporated under Wisconsin Statutes Chapter 62.

33.    The City of Milwaukee is incorporated under a special charter granted by the State Government of Wisconsin.

34.    The CTCL is a non-profit organization providing federal election grants to local governments.

35.    The CTCL was founded in 2012 by Tiana Epps-Johnson, Donny Bridges, and Whitney May.

36.    The CTCL headquarters is in Chicago, Illinois.

37.    The CTCL states that they are "a team of civic technologists, trainers, researchers, election administration and data experts working to foster a more informed and engaged democracy, and helping to modernize elections."

38.    CTCL's mission on its website includes training public election officials in communication and technology and to inform and mobilize voters.

39.    CTCL's founders – Epps-Johnson, Bridges, and May – all previously worked at the New Organizing Institute (NOI), a center dedicated to training progressive groups and Democratic campaigns in digital campaigning strategies.

7

40.     NOI's executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012.

41.     Funders of CTCL include progressive groups such as the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

42.     CTCL is also associated with Rock the Vote, who despite their non-partisan claims, has regularly featured progressive policies in its efforts to mobilize young people in elections.

43.     Along with Rock the Vote and The Skoll Foundation, CTCL also lists Facebook as a partner in their efforts.

44.     On September 1, Mark Zuckerberg and Priscilla Chan announced their $300 million investment to promote "safe and reliable voting in states and localities." See Exhibit B.

45.     Of that $300 million, $250 million is going toward CTCL and private federal election grants to counties and cities.

46.     CTCL, as a progressive organization, targets urban cities for its private federal election grants to turn out the progressive vote in the urban cities.

**CTCL's 2020 private federal elections grant application process.**

47.     CTCL markets to local election offices the federal election grants as "COVID-19 response grants":

> We provide funding to U.S. local election offices to help ensure they have the critical resources they need to safely serve every voter in 2020. See Exhibit A.

8

48.     CTCL states that it intends to award $250,000,000 of private federal election grants to local election offices for the November 3, 2020 elections and provides an application link to apply for the CTCL's private federal election grants.

> The Center for Tech and Civic Life (CTCL) is excited to expand our COVID-19 Response Grant program to all U.S. local election jurisdictions. Backed by a generous $250M contribution, CTCL will provide grants to local election jurisdictions across the country to help ensure you have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted.

> **APPLY FOR A COVID-19 GRANT**

> The deadline to apply is October 1, 2020. Questions about the COVID-19 grant application or process? Email us at help@techandcivlife.org.

See https://www.techandcivilife.org/our-work/election-officials/grants/. (Exhibit A)

49.     CTCL, on its website, states that it will take about 45 minutes for the local election officials to gather information and fill out the application for CTCL's private federal election grants:

> **CTCL COVID-19 Response Grant Application**
> We estimate it will take approximately 30 minutes to gather and prepare the materials needed to complete the COVID-19 Response Grant Application. We then expect that it will take approximately 15 minutes to complete the grant application questions below.
> For an overview of what to expect when completing the grant application, including the materials you'll need to submit,
> visit https://www.techandcivlife.org/grants/
> After submission of this information, CTCL may ask for additional information to help determine if your jurisdiction qualifies for a grant. CTCL reserves the right to verify with third party sources any information that you provide. By submitting this application, you consent to the collection of the information you submit, which may be used for the purposes described in CTCL's Privacy Policy.
> • Who is completing this grant application? *
>       First Name       Last Name
> • What is your title? *

9

- Please select the state and office (or official) you are applying on behalf of. *
- *NOTE: We are unfortunately not able to grant to election administrators in American Samoa or Guam under local law.*
- What type of jurisdiction are you submitting an application on behalf of? *
  - ○ County  ○ City  ○ Village  ○ Town  ○ Township  ○ State or Territory  ○

- I certify that I am permitted to submit this grant request on behalf of the jurisdiction listed above. *
  - ☐ Yes
- *If you are unsure who is permitted to make grant requests on behalf of your jurisdiction, we encourage you to consult your county or city attorney.*
- Your initials *
  - Initials of Requester
- Today's Date
  - 09-15-2020  Date

https://form.jotform.com/202445110530135

50. CTCL, on its website, answers the question "Why is CTCL providing grants

to election offices?":

Election officials have made it clear that one of their most pressing needs is funding. Based on this, CTCL is focusing philanthropic support to directly help election offices administer safe and secure elections in November.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

51. CTCL, on its website, answers the question "Who is providing the grant?":

CTCL is a publicly supported 501(c)(3) nonprofit organization. CTCL is proud to have a healthy mix of financial support from foundations, individual donors, and through earned revenue. By law, CTCL's financial 990s are available for public review. Grant funds will be disbursed from the Center for Tech and Civic Life.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

52. CTCL, on its website, answers the question "What kind of election expenses

do the grant funds cover?":

Election offices can use the funds to cover certain 2020 expenses incurred between June 15, 2020 and December 31, 2020. These include, but are not limited to, the costs associated with the safe administration of the following examples of election responsibilities.

**Ensure Safe, Efficient Election Day Administration**

- Maintain open in-person polling places on Election Day
- Procure Personal Protective Equipment (PPE) and personal disinfectant to protect election officials and voters from COVID-19
- Support and expand drive-thru voting, including purchase of additional signage, tents, traffic control, walkie-talkies, and safety measures

**Expand Voter Education & Outreach Efforts**
- Publish reminders for voters to verify and update their address, or other voter registration information, prior to the election
- Educate voters on safe voting policies and procedures

**Launch Poll Worker Recruitment, Training & Safety Efforts**

- Recruit and hire a sufficient number of poll workers and inspectors to ensure polling places are properly staffed, utilizing hazard pay where required
- Provide voting facilities with funds to compensate for increased site cleaning and sanitization costs
- Deliver updated training for current and new poll workers administering elections in the midst of pandemic

**Support Early In-Person Voting and Vote by Mail**

- Expand or maintain the number of in-person early voting sites
- Deploy additional staff and/or technology improvements to expedite and improve mail ballot processing

See https://www.techandciviclife.org/our-work/election-officials/grants/.

53.     CTCL, on its website, answers the question "How do I know that my office is eligible to receive a grant?":

If your U.S. election office is responsible for administering election activities covered by the grant, you're eligible to apply for grant funds.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

54. CTCL, on its website, answers the question "How much money is my office eligible to apply for?":

> Your election office will be eligible to apply for a grant amount based on a formula that considers the citizen voting age population and other demographic data of your jurisdiction. Minimum grants will be $5,000. You may choose to receive less than the offered amount if your needs or eligible expenses do not reach that amount.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

55. CTCL, on its website, answers the question "What if I share election responsibilities with another local government office?":

> If you share election responsibilities with another local government office, you are encouraged to submit one combined application for grant funds. This means you'll coordinate with your other local government offices.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

56. CTCL, on its website, answers the question "What information does my office need to provide in the grant application?":

> You will need to provide the following information in your grant application:
> - Number of active registered voters in the election office jurisdiction as of September 1, 2020
> - Number of full-time staff (or equivalent) on the election team as of September 1, 2020
> - Election office 2020 budget as of September 1, 2020
> - Election office W-9
> - Local government body who needs to approve the grant funding (if any)
> - What government official or government agency the grant agreement should be addressed to

See https://www.techandciviclife.org/our-work/election-officials/grants/.

57. CTCL, on its website, answers the question "Who should submit the application for my election office?":

12

Your election office's point of contact for the grant should submit the grant application. We leave it to you to determine who should be the point of contact.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

58. CTCL, on its website, answers the question "When can I submit my application?":

You'll be able to submit your grant application beginning the week of Tuesday, September 8, 2020.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

59. CTCL, on its website, answers the question "When will my office receive the grant?":

We recognize that election jurisdictions need funding as soon as possible to cover the unprecedented expenses of 2020 elections. We plan to move quickly! After you submit your application, CTCL anticipates that the certification and approval of your grant will take about 2 weeks. The disbursement timeline will depend on your local approval process.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

60. CTCL, on its website, answers the question "Will the grant be mailed via check or transferred via wire?":

Wiring the grant funds is faster, but you can receive the funds via a mailed check if preferred.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

61. CTCL, on its website, answers the question "What reporting is required?":

You will be required to submit a report that indicates how you spent the grant funds. The report will be in a format that should not be overly burdensome.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

62.     CTCL, on its website, answers the question "When do I report how my office spent the funds?":

You'll need to submit your grant report by January 31, 2021.

See https://www.techandciviclife.org/our-work/election-officials/grants/.

**CTCL's private federal election grants are targeted toward counties and cities with demographics that show overwhelmingly progressive voters.**

63.     The local governments that CTCL have funded have demographics with overwhelmingly progressive voters.  For example, Wayne County voted in 2016 for Hillary Clinton at a 94.95% rate over Donald Trump.

64.     As the chart below shows, CTCL's private federal election grants are targeting cities with demographics showing high rates of progressive voters.

| Jurisdiction/City | Grant Amount (in dollars) | Trump 2016 | Clinton 2016 | Clinton Percentage |
|---|---|---|---|---|
| Green Bay City, WI | 1,093,400 | 19,821 | 21,291 | 70.88% |
| Kenosha City, WI | 862,779 | 15,829 | 22,849 | 58.98% |
| Madison City, WI | 1,271,788 | 23,053 | 120,078 | 83.89% |
| Milwaukee City, WI | 2,154,500 | 45,167 | 188,653 | 80.68% |
| Racine City, WI | 942,100 | 8,934 | 19,029 | 68.05% |
| Philadelphia City, PA | 10,000,000 | 108,748 | 584,025 | 84.30% |
| Wayne County, MI-Detroit | 3,512,000 | 7,682 | 234,871 | 94.95% |
| Flint City, MI | 475,625 | 4,572 | 24,790 | 84.42% |
| East Lansing, MI | 8,500 | 4,147 | 13,073 | 75.9% |
| Lansing, MI | 440,000 | 11,219 | 32,716 | 74.46% |
| Minneapolis City, MN | 3,000,000 | 25,693 | 174.585 | 87.17% |
| Fulton County, GA - Atlanta | 6,000,000 | 110,372 | 281,875 | 69.2% |
| Richland County, SC | 730,000 | 52,469 | 108,000 | 67.2% |
| Delaware County, PA | 2,200,000 | 110,667 | 177,402 | 61.58% |
| Totals | | 548,373 | 2,003,237 | 78.50% |

65. The CTCL is funding Wisconsin cities with overwhelmingly progressive voters.

66. In 2016, Racine voted for Hillary Clinton at 68.05% rate over Trump.

67. In 2016, Milwaukee voted for Hillary Clinton at 80.68% rate over Trump.

68. In 2016, Kenosha voted for Hillary Clinton at 58.98% rate over Trump.

69. In 2016, Green Bay voted for Hillary Clinton at 70.88% rate over Trump.

70. In 2016, Madison voted for Hillary Clinton at 83.89% rate over Trump.

**CTCL's 2020 private federal election grants**

71. In 2020, CTCL has provided private federal election grants to cities and counties in at least Pennsylvania, Wisconsin, Michigan, Minnesota, South Carolina and Georgia.

72. All these states have something in common: state legislatures who will not accept CTCL's private federal elections grants.

73. So, CTCL to accomplish its objective of turning out progressive votes in the urban cities has circumvented these state legislatures by recruiting local governments to apply and agree to accept CTCL's private federal election grants.

74. For example, the CTCL recently provided a $10 million private federal election grant to the City of Philadelphia. The $10 million is to be divided as follows:

1. $5.5 million towards materials and processing equipment for mail-in and absentee voting
2. $2.27 million towards satellite election offices for in-person mail-in voting
3. $1.32 million towards in-person voting at polling places on election day
4. $552,000 for secure dropboxes and other needs
5. $370,000 for printing, postage, and other needs

75.     CTCL's private federal election grant to Philadelphia was not approved by Congress nor by the Pennsylvania state legislature.

76.     Similarly, CTCL's private federal election grants to counties and cities in Michigan, Minnesota, Pennsylvania, South Carolina and Georgia were not approved by Congress nor by the respective state legislatures.

77.     In Wisconsin, the CTCL has distributed $6.3 million of private federal election grants to the Cities of Milwaukee, Madison, Green Bay, Kenosha and Racine which have not been approved by Congress nor by the Wisconsin state legislature.

78.     Initially, CTCL with money recruited all the Wisconsin cities to apply for its CTCL's private federal election grants.

79.     Beginning as far back as April 2, 2020, Mayor Mason of Racine had corresponded with CTCL to receive and redistribute to other cities $942,000 in private funding for election administration purposes.

80.     On May 28, 2020, the CTCL awarded the City of Racine a $100,000 private federal election grant to apply and attempt to recruit "other cities in Wisconsin" to apply for CTCL's private federal election grants:

> Dear [Racine] Mayor Mason:
> I am pleased to inform you that the Center for Tech and Civic Life ("CTCL") has decided to award a grant to support the work of the City of Racine.
> AMOUNT OF GRANT:  One hundred thousand US dollars (USD $100,000)
> PURPOSE: The grant funds must be used exclusively for the public purpose of planning safe and secure election administration in the City of Racine in 2020, and coordinating such planning with other cities in Wisconsin.

Exhibit A.

81.     Racine using CTCL's initial $100,000 private federal election grant recruited the Wisconsin cities of Green Bay, Kenosha, Madison and Milwaukee to apply for the CTCL's private federal election grants.

82.     On July 17, 2020 the City of Madison is on record as accepting from Racine $10,000 in CTCL funding for specific electoral administration purposes.

83.     The CTCL granted $1.09 million to the City of Green Bay. This is nearly triple its current 2020 election budget of $329,820. See Ex. B.

84.     The CTCL granted $862,779 to the City of Kenosha. This is over four times its current 2020 election budget of $205,690. See Ex. B.

85.     The Elections Committee should take note that the CTCL granted $1.27 million to the City of Madison. This is a 50% increase to their current 2020 election budget of $2.08 million. See Ex. B.

86.     The CTCL granted $2.154 million to the City of Milwaukee. This is a 72% increase to their current 2020 election budget of $2.987 million. See Ex. B.

87.     The CTCL granted $942,100 to the City of Racine. This is over twice its current 2020 election budget of $409,529. See Ex. B.

88.     The cities of Milwaukee, Madison, Green Bay, Kenosha, and Racine applied for CTCL's private federal election grant through their joint "Wisconsin Safe Voting Plan 2020, submitted to the Center for Tech & Civic Life on June 15, 2020.  Ex. B.

89.     CTCL approved the application for private federal election grant.

90.     $2,572,839 of the CTCL's private federal election grant is to be spent through the city clerks and election officials to influence voter turnout in democrat strongholds:

Overall, our five communities are requesting $2,572,839 in resources related to enabling our municipalities to overcome these particular barriers and ensure that our voters can meaningfully access absentee voting, both by mail and in-person early voting.

Ex. B. (emphasis added).

91.     The City of Racine, its city clerk and election officials, are using the CTCL's

private federal elections grant as follows:

- "Racine: The City will recruit and promote ($1,000), train ($3,000), and employ paid Voter Ambassadors ($8,000) who will be provided with both PPE and 9 supplies ($4,000) and set up at the City's community centers to assist voters with all aspects of absentee ballot request, including photo ID compliance. Due to the increase of absentee mailed requests the City of Racine will need an additional 2 full time staff members in the Clerk's Office in order to have a reasonable turnaround time for absentee requests ($100,000). Total: $116,000."

- Racine: The City currently has one secured drop box for absentee ballots, and would like to have 3 additional drop boxes, each equipped with security cameras, to install at key locations around the City. Total: $18,000."

- "Racine: To process absentee ballot requests in April, the City estimates that it will need seven additional full-time employees to process fall election requests. These employees will be needed full-time for one month prior to the August Election (approximately $17,000) and seven weeks prior to the November election (approximately $30,000). Total: $47,000"

- "Racine: The City would like to offer a total of 3 EIPAV satellite locations for one week prior to the August election, as well as offering in-person early voting - curbside, if City Hall is still closed to the public - at the Clerk's office for 2 weeks prior to the August election. For the November election, Racine would like to offer EIPAV at 4 satellite locations two weeks prior to the election and at the Clerk's office (again, potentially curbside) 6 weeks prior. The City would need to obtain PPE, tents, supplies and cover staff time and training ($40,000). Racine would also like to have all satellite locations available for half-day voting the two Saturdays ($17,000) and Sundays ($17,000) prior to the November election, and the library and mall locations would be open until 8pm the week prior to the Election. Additional resources needed include one-time set-up fee per location ($7,500), laptops and dymo printers ($10,000), training ($1,100), and signage ($12,000.) As well, the City would like to host at least one drive-thru Voter Registration Day, where City

Hall would be set up for residents to come get registered, curbside, and get their voting questions answered by Clerk's staff. Newly registered voters could also get assistance requesting absentee ballots for upcoming elections while they're there. ($8,000) Total: $112,600"

- "Racine: The City would like to retain a communications firm to design and implement a comprehensive voter outreach communications plan ($80,000). This would include ads on Facebook, Instagram, and Snapchat. The City would also like to rent billboards in key parts of the City ($5,000) to place messages in Spanish to reach Spanish-speaking voters. The City would also like to do targeted outreach aimed at City residents with criminal records to encourage them to see if they are not eligible to vote; this outreach will be accomplished with the production, editing, and sharing of a YouTube video ($2,000) specifically on this topic shared on the City's website, social media channels, and through community partners. Racine would also like to purchase a Mobile Voting Precinct so the City can travel around the City to community centers and strategically chosen partner locations and enable people to vote in this accessible (ADA-compliant), secure, and completely portable polling booth on wheels, an investment that the City will be able to use for years to come. (Estimated cost $250,000). Total: $337,000"

- "Racine: The City needs approximately 150 poll workers for August and 300 for November, in addition to 36 Chief Inspectors, and would like to pay all workers a $100/election hazard pay ($118,000 total payroll for both elections). City notes that its desire to have more early voting locations and hours is directly impacted by its ability to hire and train election officials. To that end, the City would like to launch a recruitment campaign that includes radio ads ($1,000), ads on social media platforms ($10,000), billboards in strategic City locations ($5,000), and film videos for high school students in history/government classes ($500). The City would also like to enlist a communication firm to: create a training video for election officials, develop an online quiz, detailed packets for election officials, and a PPE video filmed by a health professional about necessary COVID-19 precautions during all voting operations ($22,000 total). Racine would also like to hire a liaison position to schedule, training and facilitate poll workers. ($35,000) Total: $181,500."

- "Racine: Racine plans to issue all 36 wards its own PPE supply box which will each include masks, cleaning supplies, pens for each voter, gloves, hand sanitizer, safety vests, goggles, etc. ($16,000). The City also needs large signs to direct and inform voters printed in English and Spanish ($3,000). Additionally, the City would like to deploy a team of paid trained EDR Specialists for each polling location ($10,000, including hourly pay, training expenses, and office supplies). As well, Racine would like iPads with cellular signal for each polling location to be able to easily verify voters' registration status and ward

($16,000). The City would like to equip all wards with Badger Books ($85,000); Racine began using electronic poll books in the February 2020 election and has found they dramatically increase and facilitate EDR, verification of voters' photo ID, expedite election processes, and reduce human error. Total: $130,000"

Ex. B.

92.     The City of Milwaukee, its city clerk and election officials, are using the

CTCL's private federal elections grant as follows:

- "Milwaukee: The City notes that the biggest obstacle to Milwaukee residents,particularly those in poverty, to applying for an absentee ballot in April was access to the internet and securing an image of their photo ID. To address this, the City will be promoting and utilizing Milwaukee Public Library branch staff ($90,000 for both elections) for 3 weeks prior to each election to assist any potential absentee voters with applying, securing, and uploading images of their valid photo ID. Total: $90,000"

- "Milwaukee: The City would like to install secure 24-hour drop boxes at all 13 Milwaukee Public library branches, staffed with socially distanced volunteers to serve as witnesses. Total: $58,500"

- "Milwaukee: Given its tremendous volume of absentee ballot requests and processing tasks which far exceeds that of the other municipalities, Milwaukee would like to completely automate and expedite the assembly and mailing of requested absentee ballots. The City would like to purchase a high-speed, duplex printer, a top-of-the-line folding machine, and a high quality folding and inserting machine. This would reduce staff costs and eliminate the use of absentee labels, by enabling the City to print directly onto inner and outer envelopes. This would also allow the City to have a small 2D barcode that the inserter machine would be able to scan to ensure that the outer envelope is for the same voter; increasing quality controls. This automation would enable the City to eliminate the assembly delay no matter the volume of daily absentee, allowing experienced election workers and previously trained election temporary employees to be re-deployed to early voting sites as supervisors and lead workers. Total: $145,000"

- "Milwaukee: The City would like to set up 3 in-person early voting locations for two weeks prior to the August election ($150,000) and 15 in-person early voting 13 locations and 1 drive-thru location, potentially at a central location like Miller Park, for four weeks prior to the November election ($450,000). (Establishing this many EIPAV sites requires a significant investment in IT equipment, an additional ballotar printer, tents, signage, and traffic control

20

assistance. Milwaukee would also like to offer evening and weekend early voting hours which would add additional costs for both August ($30,000) and November ($75,000). Total: $705,000."

- "Milwaukee: Would like to partner with other City divisions to develop mailings and door hangers ($10,000) that could accompany water bills, be distributed by the Department of Neighborhood Services, or hung on trash receptacles by sanitation staff. The City would also like to revamp current absentee voting instructions to be more visual, address issues specific to the pandemic such as securing a witness signature, prepare it in English and Spanish, and print 150,000 color copies (estimated total $15,000). The Election Commission would also like to produce a short video ($5,000) with visuals showing voters how to apply for an absentee ballot and how to correctly complete and return the ballot. Additionally, the Election Commission would like to hire a communications firm to prepare and implement a comprehensive voter outreach communications plan ($250,000). This communications effort would include numerous voter education ads and PSAs on radio, billboards, buses, with some using local celebrities like Milwaukee Bucks players. This communications effort would focus on appealing to a variety of communities within Milwaukee, including historically underrepresented communities such as LatinX and African Americans, and would include a specific focus on the re-enfranchisement of voters who are no longer on probation or parole for a felony. Additionally, this campaign would include an edgy but nonpartisan and tasteful communications campaign to harness the current protests' emphasis on inequity and ties that message to voting. The video, the ads, and the PSAs could all also be placed on social media, the Election Commission and City websites, and GOTV partner websites and social media. Total: $280,000"

- "Milwaukee: The City plans to have 45 voting locations in August and to keep open as many of the normal 180 polling places as possible in November. August will require 3 chief inspectors per site and 20 election workers per site, for a total of 1200 election workers minimum and 150 chief inspectors. The City has a goal of recruiting 1,000 new election workers. The City would like to add an additional $100 per worker in hazard pay to the poll workers' stipends of $130 ($460,000 additional for both elections) and $100 hazard pay to chief inspector stipends of $225 ($87,750 additional for both elections). Additionally, the City of Milwaukee utilizes a Central Count of absentee ballots, which necessitates 15 chiefs and 200 election workers per election at Central Count ($50,000/day for 2- days each election for a total of $200,000). Total payroll for both elections will reach $750,000 based upon these calculations. The City will launch a recruitment campaign for a new generation of election workers to sign up and be involved in their democracy, and hopes this effort can be included in the above request for resources for a marketing

21

firm. Recruiting new and younger poll workers means that the Election Commission will need to innovate in election training. The Commission would like to produce polling place training videos ($50,000) with live small-group, socially distanced discussions and Q&A sessions. These videos will augment existing training manuals. Total: $800,000"

- "Milwaukee: The City will be purchasing 400 plexiglass barriers ($55,000) for election workers at all polling location receiving and registration tables. Additionally, the Milwaukee Election Commission will need to acquire 400 face shields for workers not staffed behind plexiglass ($4,000), gloves for all poll workers ($3,000), masks on hand for election workers and members of the public ($5,000), hand sanitizer ($2,000) and disinfectant ($2,000). Additionally, since Milwaukee also plans to offer curbside voting as an option at all polling places, updated, larger, more visible signage is necessary ($5,000). Total: $76,000"

Ex. B.

93.     The City of Kenosha, its city clerk and election officials are using the CTCL's

private federal elections grant as follows:

- "Kenosha: The City would like to have Clerk's staff train library staff on how to help residents request and complete absentee ballots, would like to produce ($3,000) and mail ($26,200) a bilingual absentee ballot instruction sheet with all absentee ballots to increase correctly completed and submitted ballots. The City would like to hire a trainer for seasonal election workers, volunteers and poll workers. This employee would also coordinate assignments to polling locations, the early driver up voting site, the Clerk's office for assistance in processing, data entry and filing of absentee requests and the Absentee Board of Canvassers (approximately $50,000). The increase in absentee ballots due to COVID-19 has tremendously increased the workload of the department. In order to properly serve the citizens and voters additional LTE employees are needed (approximately $175,000). Total: $254,200"

- "Kenosha: The City currently has two drop-boxes that are checked throughout the day, and would like to install 4 additional internal security boxes at Kenosha libraries and the Kenosha Water Utility so that each side of town has easy access to ballot drop-boxes. Total: $40,000?"

- "Kenosha: The City needs resources for absentee ballot processing, to staff and process early, in-person absentee requests, and to answer

voters' questions (approximately $100,000). Additional workers are also needed to canvass absentee ballots (approximately $11,000) Total: $111,000"

- "Kenosha: The City plans to have one early voting location, at City Hall, and plans to hold early voting two weeks before the August election, with no weekendor evening hours planned, and 4 weeks before the November election, with access until 7pm two days/week and Saturday voting availability the week before the election. If City Hall is still closed to the public, they will explore offering early drive thru voting on City Hall property. Resources are needed for staffing (approximately $40,000), PPE ($1,050), signage ($200), laptops, printers, and purchase of a large tent ($8,789) to utilize for drive thru early voting. Staff could see voters' ID, print their label, hand them their ballot, and then collect the completed envelope. This would also allow staff to help voters properly do certification and provide witness signatures if necessary. The City could do thisfor one full week before elections. Total $50,039."

- "Kenosha: Would like to directly communicate to all Kenosha residents via professionally-designed targeted mail postcards that include information about the voter's polling location, how to register to vote, how to request an absentee ballot, and how to obtain additional information. The City would have these designed by a graphic designer, printed, and mailed ($34,000). The City would also like resources for social media advertising, including on online media like Hulu, Spotify, and Pandora ($10,000) and for targeted radio and print advertising ($6,000) and large graphic posters ($3,000) to display in low-income neighborhoods, on City buses, and at bus stations, and at libraries ($5,000). Total: $58,000"

- "Kenosha: The City needs to hire 350 poll workers per election ($100,000). They would like to offer hazard pay to increase pay to $160/worker and $220/chief inspectors ($10,840). To aid in recruitment efforts, the City would like to hire a recruiter and liaison position for poll workers ($35,000). Total: $145,840."

- "Kenosha: The City would like to purchase automatic hand sanitizer dispensers for all polling locations ($14,500) as well as PPE (gloves, masks, disinfectant, etc.) for all poll workers and voters ($15,200). Kenosha would also like to be able to offer elderly residents and people with disabilities who wish to vote in person on Election Day two-way transportation, utilizing a local organization such as Care-A-Van ($2,000). The City also needs resources for technology improvements

to include a ballot opener, a ballot folder, 12 additional laptops and dymo printers, and high-speed scanner tabulators ($172,000 total) to expedite election day processing and administration. Total: $203,700"

Ex. B.

94.  The City of Green Bay, its city clerk and election officials, are using the

CTCL's private federal elections grant as follows:

- "Green Bay: The City would like to employ bilingual LTE "voter navigators"($45,000) to help residents properly upload valid photo ID, complete their ballots and comply with certification requirements, and offer witness signatures. These voter navigators can assist voters prior to the elections and then also be trained and utilized as election inspectors. They would also like to utilize paid social media and local print and radio advertising to educate and direct voters in how to upload photo ID and how to request and complete absentee ballots. ($2,000) Total: $47,000"
- "Green Bay: The City would like to add secure (security cameras $15,000) ballot drop-boxes (approximately $900 each) at a minimum of the transit center and two fire stations, but if funding were available would also install secure drop boxes at Green Bay's libraries, police community buildings, and potentially several other sites including major grocery stores, gas stations, University of Wisconsin Green Bay, and Northern Wisconsin Technical College, in addition to the one already in use at City Hall. Total: $50,000"
- "Green Bay: The City needs 45 additional staff to process absentee ballot requests before the election, to open and verify envelopes on Election Day,and insert them into the tabulators. After the election, staff are needed to enter new voter registrations and assist with all election certification tasks ($140,000 for staffing) The City would also like to purchase a ballot opener and ballot folder to expedite processing ($5,000). Total: $145,000."
- "Green Bay: The City would like to expand and establish at least three EIPAVsites in trusted locations, ideally on the east (potentially UWGB) and west sides (potentially NWTC or an Oneida Nation facility) of the City, as well as at City Hall.  The City is planning to offer early voting starting two weeks before each election, with several weekdays available until 6:30pm and Saturdays 10am-4pm. They would like to staff these early voting sites with election inspectors who are

bilingual and would like to increase the salary rate for these bilingual election inspectors to assist with recruitment and retention, as well as in recognition of their important role at these sites. The City also will need to print additional ballots, signage, and materials to have available at these early voting sites. Total: $35,000."

- "Green Bay: The City needs to hire a total of 380 workers per election (total $112,660). The City would like to pay poll workers more than they have previously received, to signify their importance in the process and to acknowledge the extra challenge it represents to serve as an election official during a pandemic. The City would like to increase poll worker salaries by 50% (additional $56,330). All poll workers will be trained through the Wisconsin Elections Commission website and the City's own training manual ($6,000). Total: $174,900"

- "Green Bay: Would like to reach voters and potential voters through a multi-prong strategy utilizing "every door direct mail," targeted mail, geo-fencing, billboards, radio, television, and streaming-service PSAs, digital advertising, and automated calls and texts ($100,000 total). The City would also like to ensure that these efforts can be done in English, Spanish, Hmong, and Somali, since roughly 11% of households in the Green Bay area speak a language other than English. Ideally, the City would employ limited term communications staff or engage communications consultants ($50,000) from August through the November election to design these communications and design and launch paid advertising on Facebook, Twitter, and Instagram, also in multiple languages. The City would also like to directly mail to residents who are believed to be eligible but not registered voters, approximately 20,000 residents. It would require both considerable staff time to construct that list of residents and directly mail a professionally-designed piece (in multiple languages) to those voters. ($50,000 total for staffing, design, printing, and postage). To assist new voters, the City would also like resources to help residents obtain required documents (i.e. birth certificates) which are needed to get a valid state ID needed for voting. These grant funds ($15,000) would be distributed in partnership with key community organizations including churches, educational institutions, and organizations serving African immigrants, LatinX residents, and African Americans. Total: $215,000"

- "Green Bay: Green Bay would like to purchase 135 electronic poll books ($2,100/each for a total of $283,500) to reduce voter lines, facilitate Election Day Registrations and verification of photo ID. The City would also like a high speed tabulator ($62,000) to count absentee ballots on Election Day, a ballot opener and ballot folder ($5,000), and

additional staff to process absentee ballots on Election Day ($5,000). The City also needs masks, gloves, gowns, hair nets, face shields ($15,000), cough/sneeze guards ($43,000), and disinfectant supplies ($3,000). Total: $426,500"

Ex. B.

95.　　The Elections Commission should take note that the City of Madison, its city clerk and election officials, are using the CTCL's private federal elections grant as follows:

- "Madison: Plans to hold curbside "Get your ID on File" events with the Clerk this summer utilizing volunteers or paid poll workers ($15,000) equipped with PPE (estimated $5,000) and digital cameras ($4,500) to capture voter ID images for voters who are unable to electronically submit their IDs to the Clerk's office. They also need large flags to draw attention to these curbside sites ($4,000). Would also like mobile wifi hotspots and tablets for all of these sites ($100,000) so voters could complete their voter registration and absentee requests all at once, without having to wait for staff in the Clerk's office to follow up on paper forms. (These mobile wifi hotspots, tablets, and flags, could all then be repurposed forearly in-person voting closer to the election.) Total: $128,500"
- "Madison: The City would like to have one secure drop box for every 15,000 voters, or 12 drop boxes total ($36,000). The City would also like to provide a potential absentee ballot witness at each drop box, utilizing social distancing and equipped with PPE (staff costs unknown): Total: $50,000"
- "Madison: Based on data from April, the City estimates it will need additional staffing ($110,000) for hourly election clerks for the fall elections, and will incur 11 additional overtime costs ($100,000) for staff processing of absentee ballots and other election-related tasks. Total: $210,000"
- "Madison: The City would like to provide 18 in-person absentee voting locations for the two weeks leading up to the August election, and for the four weeks leading up to the November election. Their original plan was to offer in-person absentee voting at all nine library locations, the City Clerk's Office, a city garage, Edgewood College, two Madison College locations, and four UW-Madison locations. Due to weather uncertainties, they will need to purchase and utilize tents ($100,000) for the curbside voting locations in order to protect the ballots, staff, and equipment from getting wet and will also need large feather flags to identify the curbside voting sites. (Additional staff costs

26

covered by the earlier question re. Absentee ballot processing.) The City would also like to get carts ($60,000) for our ExpressVote accessible ballot marking devices so we can use the ExpressVote for curbside voting to normalize the use of ExpressVote to help voters with disabilities feel less segregated during the voting process. Total: $160,000."

- "Madison: Would like to engage the City's media team to produce videos to introduce voters to the election process, voting options, and to explain the safety precautions taken at polls and early voting sites. These videos would then be shared in numerous ways, including through partner organizations and on the City's social media platforms. The City would also like to partner with community organizations and run ads on local Spanish-language radio, in the Spanish-language newspapers, on local hip hop radio stations, in African American-focused printed publications, and in online publications run by and for our communities of color (advertising total $100,000). Additionally, the City has many poll workers who are from historically disenfranchised communities. The City would like to pay those poll workers ($75,000) to conduct voter outreach and additional poll worker recruitment activities. Total: $175,000."

- Madison: The City utilizes the election toolkit available through the MIT Technology Project to determine the staffing levels needed to ensure that voters will not have to wait in line for more than 15 minutes. In addition to the one Chief Inspector per polling location, Madison also has additional election officials who are certified as the Absentee Lead at each polling location. Madison estimates that if 75% of votes cast are absentee, the City will need 1,559 election officials at the polls in August. The City envisions a robust and strategic poll worker recruitment effort, focusing on people of color, high school students, and college students. The City would like to have resources for hazard pay for poll workers this fall at a rate comparable to what the U.S. Census is paying in the area ($369,788). The City has also found it challenging to convince facilities to host a polling location in the midst of a pandemic, and would like to provide each facility with a small amount of funds to compensate for their increased cleaning andsanitization costs ($750/location, $138,000 total). Total: $507,788"

- "Madison: The City needs hand sanitizer for all poll workers and voters, disinfectant spray, plexi-glass shields to allow poll workers to split the poll books, face shields for curbside election officials, and face masks for all poll workers and observers ($20,000) as well as renting additional space to safely and accurately prepare all supplies and practice social distancing at the public test of election equipment ($20,000) If the new voter registration form is not

translated by the state into both Spanish and Hmong, Madison plans to translate the form ($500). Total: $40,500"

Ex. C.

**CTCL's private federal election grants are to increase voter participation in the Wisconsin cities which can be accomplished without creation of a public-private partnership regarding Minneapolis's election administration.**

96.     CTCL's private federal election grants are to increase voter participation in the Wisconsin cities.

97.     CTCL's goal of increasing voter participation in the Wisconsin cities can be accomplished without the funding through the respective Wisconsin cities.

98.     Instead, CTCL could spend the funds directly on get-out-to-vote (GOTV) efforts like other non-profits do.

99.     Therefore, for CTCL to accomplish its goal of increasing voter participation in the Wisconsin cities, it is unnecessary for there to be a public-private partnership between CTCL and each Wisconsin city regarding each respective city's election administration.

## COUNT I

**The Wisconsin cities act ultra vires, without legal authority, to accept CTCL's private federal election grants under the Elections Clause, Supremacy Clause, HAVA, NVRA and Wisconsin Statutes § 12.11 prohibiting election bribery.**

100.     The Plaintiffs incorporate this complaint's previous paragraphs.

101.     The Center for Tech and Civic Life (CTCL) has distributed private federal election grants, totaling $6,324,527, to the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison.

102.    But, HAVA left discretion to the "states," not the cities, on how to implement federal elections:

> The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.[3]

103.    Federal election law defines the word "state":

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.[4]

104.    So, under federal election law, the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison are not "states."

105.    Accordingly, they have no legal authority to accept and use private federal election grants.

106.    The following federal law and state law preempt the Wisconsin cities from accepting and using private federal election grants: U.S. Constitution's Elections Clause and Supremacy Clause, National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501-20511, Help America Vote Act, 52 USC §§ 20901-21145, and Wisconsin Statutes § 12.11 prohibiting election bribery.

107.    Because of the preemptive effects of these laws, the Cities of Racine, Milwaukee, Kenosha, Green Bay and Madison have acted ultra vires, without legal authority, to accept and use CTCL's private federal election grants.

108.    The Plaintiffs are entitled to prospective declaratory and injunctive relief.

---

[3] 52 U.S. Code § 21085, Pub. L. 107–252, title III, § 305 (Oct. 29, 2002), 116 Stat. 1714.

[4] 52 USC § 21141.

109.    Specifically, the following laws preempt the defendant cities' actions of

approving and using CTCL's private federal election grants.

**U.S. Constitution's Elections Clause and Supremacy Clause**

110.    The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy

Clause preempts CTCL's private federal elections grants to local governments.

111.    The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, section 4, clause 1.

112.    The Supremacy Clause states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Constitution, Art. VI, para. 2.

113.    The Elections Clause, as applied here, ensures that the federal government

and state legislatures determine the time, place and manner of federal elections—not CTCL

and local governments.

114.    The Supremacy Clause, as applied here, ensures that local governments do not

act contrary to federal and state law regarding federal elections.

115.    The Elections Clause and Supremacy Clause preempt CTCL's private federal

election grants to local governments.

116.     CTCL's private federal election grants are not legally authorized by federal law nor state law.

117.     The cities of Milwaukee, Madison, Green Bay, Kenosha, and Racine have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

**The Wisconsin cities' CTCL private federal election grants are a constitutionally-impermissible public-private partnership.**

118.     The Wisconsin cities' CTCL private federal elections grants are a constitutionally-impermissible public-private partnership.

119.     The case law shows that the CTCL private federal election grant is in a subject area, federal elections, where public-private partnerships are constitutionally impermissible.

120.     The federal courts have a tradition in different subject areas of drawing a line where public-private partnerships are constitutionally impermissible. Federal elections are a subject where the federals should hold that private-public partnerships are constitutionally impermissible.

121.     *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group. The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.*   The court stated that the

government favoring a demographic group was equivalent to the government disfavoring a demographic group:

> Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups. In both situations, the government has diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate. In neither case is the election "free and equal."

*Id.*

122.     In *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), the U.S. Supreme Court drew such a line finding a public-private partnership constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute. This "religious" motive was improper for the state and the statute forming the new district was stuck down. 512 U.S. at 691.

123.     Similarly, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the U.S. Supreme Court held another public-private partnership unconstitutionally impermissible. Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy. They developed a program where the hospital would test for the presence of cocaine and provide a program to help with abstinence. If the patient refused, the results were shared with the prosecutor's office which in turn would encourage participation at the threat of prosecution. The U.S. Supreme Court found the entanglement

of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. 532 U.S. at 86.

124.    Similarly, the entanglement of public and private interests involved with Wisconsin cities accepting and using CTCL's private federal election grant are unconstitutionally impermissible.

125.    The idea of the federal and state government exclusively funding federal elections is to eliminate undue influence and the appearance of undue influence by private parties.

126.    CTCL's private funding of federal elections re-introduces undue influence and the appearance of undue influence into federal elections—which is constitutionally impermissible.

**Help America Vote Act (HAVA)**

127.    The Help America Vote Act (HAVA), 52 USC § 209, preempts CTCL's private federal election grants for the following reasons.

128.    HAVA established the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the states.

129.    EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program.

130.    EAC is also responsible for maintaining the National Voter Registration form, conducting research, and administering a national clearinghouse on elections that includes shared practices, information for voters and other resources to improve elections.

131.     HAVA requires that the states implement the following new programs and procedures:

- Provisional Voting
- Voting Information
- Updated and Upgraded Voting Equipment
- Statewide Voter Registration Databases
- Voter Identification Procedures
- Administrative Complaint Procedures

132.     In the past, Wisconsin's HAVA plan, required by HAVA, was approved by the EAC.

133.     HAVA's purpose was to coordinate federal and state administration of federal elections.

134.     HAVA does not legally authorize local governments to accept private federal election grants.

135.     HAVA's preemption prohibits local governments from accepting private federal election grants.

136.     Under HAVA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way.

137.     The CTCL's private federal election grants circumvent the EAC and the states and thus conflict with HAVA.

138.     Under HAVA, the EAC and the states work toward election plans and budgets.

139.     CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election administration plans and budgets—thus, conflicting with HAVA.

140.     The federal and state money distributed to county and city clerks that administer elections are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for election purposes.

141.     But, local governments accepting CTCL's private federal election grants, violate HAVA by injecting money into federal elections which is not approved by the EAC or the states.

142.     States are not allowed to deviate from plans submitted under HAVA. Local governments accepting CTCL's private federal election grants, violate HAVA.

143.     The CTCL's private federal election grants to local governments are not part of HAVA.

144.     Wisconsin, consistent with HAVA and under the EAC's guidance, has already approved a fiscal plan for its elections. The CTCL's private federal election grants to the Wisconsin's cities circumvents and violates that fiscal plan.

145.     In Wisconsin, it is too late for the state to modify its plan around CTCL's private federal election grants to ensure the legally-authorized, uniform and fair election HAVA requires.

146.     The Supremacy Clause, as applied to HAVA, ensures that Wisconsin cities do not act contrary to HAVA regarding federal elections.

147. HAVA preempts CTCL's private federal election grants to the cities.

148. Under the Supremacy Clause and HAVA, CTCL's private federal election grants are not legally authorized by federal law or state law.

149. The cities of Milwaukee, Madison, Green Bay, Kenosha, and Racine have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

**National Voters Registration Act (NVRA)**

150. National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, preempts CTCL's private federal election grants for the following reasons.

151. Congress enacted the National Voter Registration Act of 1993 (also known as the "Motor Voter Act"), to create "national procedures for voter registration for elections for Federal office." 52 U.S.C. § 20503.

152. The Act gave responsibility to the Federal Election Commission (FEC) to provide States with guidance on the Act, to develop a national mail voter registration form, and to compile reports on the effectiveness of the Act. A 2002 amendment in HAVA transferred the FEC's responsibilities under the Act to the EAC.

153. Section 5 of the NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for a driver's license or seek to renew a driver's license, and requires the State to forward the completed application to the appropriate state or local election official. 52 U.S.C. § 20504.

154. Section 6 of the NVRA provides that citizens can register to vote by mail using mail-in-forms developed by each state and the Election Assistance Commission. 52 U.S.C. § 20505.

155. Section 7 of the NVRA requires states to offer voter registration opportunities at all offices that provide public assistance and all offices that provide state-funded programs primarily engaged in providing services to persons with disabilities. Each applicant for any of these services, renewal of services, or address changes must be provided with a voter registration form of a declination form as well as assistance in completing the form and forwarding the completed application to the appropriate state or local election official. 52 U.S.C. § 20506.

156. Section 8 of the NVRA also creates requirements for how States maintain voter registration lists for federal elections. 52 U.S.C. § 20507.

157. NVRA's purpose was to coordinate federal and state administration of voter registration for federal elections and to create legally-authorized, nationwide, and uniform standards for voter registration.

158. NVRA does not legally authorize local governments to accept private federal election grants for voter registration.

159. NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration.

160. Under NVRA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way on voter registration for federal elections.

161. The CTCL's private federal election grants circumvent the EAC and the states and thus conflicts with NVRA.

162. Under NVRA, the EAC and the states work toward voter registration plans and budgets.

163. CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

164. The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration.

165. But, local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration which is not approved by the EAC or the states.

166. States are not allowed to deviate from the NVRA. Local governments accepting CTCL's private federal election grants, violate NVRA.

167. The CTCL's private federal election grants to local governments are not part of NVRA.

168. Wisconsin, consistent with NVRA and under the EAC's guidance, has already approved a fiscal plan for voter registration for federal elections. The CTCL's private federal election grants to the Wisconsin's cities circumvent and violate that fiscal plan.

169.     In Wisconsin, it is too late for the state to modify its plan in response to CTCL's private federal election grants to ensure the legally-authorized, uniform and fair election NVRA requires.

170.     The Supremacy Clause, as applied to NVRA, ensures that Wisconsin cities do not act contrary to NVRA regarding federal elections.

171.     NVRA preempts CTCL's private federal election grants to the cities.

172.     Under the Supremacy Clause and NVRA, CTCL's private federal election grants are not legally authorized by federal law or state law.

173.     The cities of Milwaukee, Madison, Green Bay, Kenosha, and Racine have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

**Wisconsin Statutes § 12.11 prohibits election bribery preempting local govenrments from accepting private federal election grants.**

174.     Wisconsin Statutes § 12.11 is violated by CTCL's private federal election grants to cities.

175.     Wisconsin election officials accepting and using CTCL's private federal election grants violate Wisconsin Statutes § 12.11.

176.     Section §12.11 prohibits public officials from accepting "anything of value… in order to induce any elector to…go to or refrain from going to the polls..[or] to vote or refrain from voting.

177.     Wisconsin Statutes § 12.11 (1m) states:

(1m)  Any person who does any of the following violates this chapter:
(a)  Offers, gives, lends or promises to give or lend, or endeavors to procure, anything of value, or any office or employment or any privilege or

immunity to, or for, any elector, or to or for any other person, in order to induce any elector to:
1. Go to or refrain from going to the polls.
2. Vote or refrain from voting.
3. Vote or refrain from voting for or against a particular person.
4. Vote or refrain from voting for or against a particular referendum; or on account of any elector having done any of the above.

178. Under the same section, "anything of value" is defined to includes "any amount of money, or any object which has utility independent of any political message it contains and the value of which exceeds $1." Wis. Stat. § 12.11.

179. Wisconsin Statutes § 12.11 preempts CTCL's private federal election grants to the cities.

180. CTCL's private federal election grants are not legally authorized under Wisconsin Statutes § 12.11.

181. The cities of Milwaukee, Madison, Green Bay, Kenosha, and Racine have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

**Demand for Jury Trial**

182. Plaintiffs demand a jury trial.

**Prayer for Relief**

Therefore, the Plaintiffs respectfully ask that this Court to:

1. Grant declaratory relief that the Cities of Green Bay, Kenosha, Madison, Milwaukee and Racine have acted ultra vires, acted without legal authority, in accepting CTCL's private federal election grants.

40

2.      Issue an injunction enjoining the Cities of Green Bay, Kenosha, Madison, Milwaukee and Racine from accepting or using the CTCL's private federal election grants.

3.      Award the Plaintiffs all costs, expenses, and expert witness fees allowed by law;

4.      Award the Plaintiffs attorneys' fees and costs allowed by law; and

5.      Award the Plaintiffs such other and further relief as this Court deems just.

Dated:  September 24, 2020

*Electronically Signed by Erick G. Kaardal*
Erick G. Kaardal, No. 1035141
Special Counsel to Amistad Project
of the Thomas More Society
Gregory M. Erickson, 1050298
William F. Mohrman, 168816
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Facsimile:  612-341-1076
Email:  kaardal@mklaw.com
*Attorneys for Plaintiffs*
