# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Wisconsin Voters Alliance, David Tarczon, Elizabeth Clemens-Tarczon, Jonathan Hunt, Paula Perez, Maria Eck, Douglas Doeran, Navin Jarugumilli. <br><br> Plaintiffs, <br><br> vs. <br><br> City of Racine, City of Milwaukee, City of Kenosha, City of Green Bay, City of Madison, Wisconsin Election Commission, <br><br> Defendants. | Court File No. 20-cv-01487 WCG <br><br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

The Defendants City of Racine, City of Milwaukee, City of Kenosha, City of Green Bay and the City of Madison have moved to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure governing lack of subject matter jurisdiction. Specifically, they allege the Plaintiffs lack standing.[1] But, the Plaintiffs Wisconsin Voters Alliance, David Tarczon, Elizabeth Clemens-Tarczon, Jonathan Hunt, Paula Perez, Maria Eck, Douglas Doeran, Navin Jarugumilli assert that they do have standing.

Indeed, the legal principles are not at issue. "The elements of standing are well settled: the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision.[2] These requirements are rooted in Article III,

---

[1] Defs. Jt. Memo. to Dismiss 1 (Oct. 09, 2020).
[2] *Casillas v. Madison Ave. Associates, Inc.,* 926 F.3d 329, 333 (7th Cir. 2019) *citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

which limits a federal court's authority to the resolution of 'Cases' or 'Controversies.'³ If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."

Moreover, the "injury-in-fact" requirement, as described by the U.S. Supreme Court, is the "[f]irst and foremost" element of standing."⁴ "An 'injury in fact' is 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" ⁵ "An alleged harm need not be tangible to be 'concrete,' but it must be 'real,' and not 'abstract.'"⁶

I. **Plaintiffs have an injury-in-fact and can establish a causal connection between their injury and a city conducting an election otherwise governed by state and federal laws, with nongovernmental corporate conditions.**

First, the Defendant Cities do not challenge the assertions of the Voters Alliance's Complaint⁷ that they accepted private funding for election purposes, including for federal elections.⁸ Second, the Cities have not challenged that the grants of private moneys were conditional; the Cities, as public governmental entities were to report back to the non-profit corporation, Center for Tech and Civic Life, as to how the moneys were used for election purposes.⁹ There is no dispute that not all cities in Wisconsin received CTCL private monetary grants from nongovernmental corporations for election purposes.¹⁰

---

³ *Id.* U.S. Const. art. III, § 2.
⁴ *Id. quoting Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998).
⁵ *Id. quoting Lujan*, (citations and quotation marks omitted).
⁶ *Id. quoting Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016).
⁷ For ease of reading, unless otherwise stated, references to "Voters Alliance" is inclusive of all Plaintiffs.
⁸ Plts. Compl. *e.g.* ¶¶79–89.
⁹ *Id. e.g.,* ¶61.
¹⁰ *Id. e.g.,* ¶¶ 79–89.

Finally, the Cities do not challenge that the individual Plaintiffs, David Tarczon, Elizabeth Clemens-Tarczon, Jonathan Hunt, Paula Perez, Maria Eck, Douglas Doeran, Navin Jarugumilli are voters and reside within the jurisdictions of each City as claimed in the underlying Complaint.[11]

As voters, each individual Plaintiff has a fundamental right to vote.[12] Thus, they have a recognized protectable interest. As the U.S. Supreme Court has long recognized, a person's right to vote is "individual and personal in nature."[13] Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage.[14] "Safeguarding the integrity of the electoral process is a fundamental task of the Constitution, and we must be keenly sensitive to signs that its validity may be impaired."[15]

Here, each individual voter resides within the boundaries of a city that has *added* another regulatory level to elections, by a nongovernmental government corporation, by accepting *conditions* for moneys in the conduct of elections. It is of no significance what those conditions are. The significance is that the conditions were imposed by a nongovernmental entity upon a public governmental city in the conduct of elections and, in turn, will report *back* to the nongovernment entity about *the election contest*. Within each jurisdiction of the Cities, they are conducting elections under nongovernmental corporate conditional grants, in which other cities in Wisconsin are *not*. Here, the individual Plaintiffs are subject to an

---

[11] *Id.* ¶¶5–11.
[12] Reynolds *v. Sims,* 377 U.S. 533, 554–55, 562 (1964).
[13] *Id.* 377 U.S. at 561.
[14] *Gill v. Whitford,* 138 S. Ct. 1916, 1929 (2018).
[15] *Johnson v. FCC,* 829 F.2d 157, 163 (D.C. Cir. 1987).

election process that has another layer of adopted election regulations as dictated by nongovernmental corporate conditions regarding the conduct of the elections in which other voters in other jurisdictions were not. In other words, the Cities are charged with the conduct of elections—including federal elections—under federal and state laws to ensure a uniform election practice. As we should agree, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system."[16] And, when nongovernment corporate entities are allowed to impose conditions on governments whose core government function is to conduct elections, the integrity of the electoral process is challenged.

For example, to enhance the efficiency and integrity of election administration, soon after the disputed 2000 election, Congress passed the Help America Vote Act of 2002 ("HAVA"). HAVA is the cornerstone of "a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient."[17] Likewise, with the National Voters Registration Act, Congress reiterated, among other things, that it is the duty of the federal, state, and local governments to promote the exercise of that right and one of the purposes of the Act is to protect the integrity of the electoral process.[18] In both Acts, Congress is imposing legal requirements upon public governmental entities to protect the electoral process and to enhance the opportunities of exercising the right to vote—uniformly. The same may be said of Wisconsin election laws; they promote the exercise of the right to vote by ensuring the integrity of the electoral process.

---

[16] *Burdick v. Takushi*, 504 U.S. 428, 441 (1992) (citations omitted).
[17] 52 U.S.C. § 209; *see e.g.* Plts. Compl. ¶127.
[18] 52 U.S.C. §§20501–20511; *see e.g.* Plts. Compl. ¶150.

Thus, by federal and state election laws, the government has agreed to protect the fundamental right to vote and maintain the integrity of an election contest as fair, honest, and unbiased to maintain the structure of the democratic process. The voters, in turn, agree to accept the government's announcement of the winner of an election contest, including federal elections, to maintain the integrity of the democratic system of the United States.

This arrangement constitutes a "social contract" between the voter and the government.[19] The uniformity of election laws is part of that contract. But, participating in an election contest with *nongovernmental corporate* imposed conditions regarding the electoral process, regardless of how bine they may be, is *not* what the voters bargained for. The social contract with their local government was the assurance of uniform elections under *federal* and *state election laws,* without a layer of nongovernmental corporate conditions.

This social contract is what is personally at risk for the Plaintiffs in the outcome of the controversy. [20] Other cities do not have nongovernmental corporate conditions regarding the conduct of their elections. Hence, the disadvantage of each respective individual Plaintiff is distinct to the jurisdictional boundaries in which he or she lives within their respective Defendant City much like cases involving gerrymandering.[21] And, at the time of the filing of the underlying action, the Plaintiffs impeding injury was certain—the election contest was less than a month away. There was no speculation.[22]

---

[19] *Dumonde v. U.S.,* 87 Fed. Cl. 651, 653 (Fed. Cl. 2009) ("Historically, the Constitution has been interpreted as a social contract between the Government and people of the United States," *citing Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 176 (1803).
[20] *Gill,* 138 S.Ct. at 1923.
[21] *Id.* at 1929–30.
[22] *See Clapper v. Amensety Int'l USA,* 568 U.S. 398, 409 (2013).

This lawsuit is not about voter fraud.[23] The harm is the loss of the uniformity of an election contest conducted as a core *governmental* function under federal and state election laws to ensure the integrity of the election. In turn, the acceptance of the outcome with additional conditions of a nongovernmental corporate entity interferes with the social contract between the voter and the government. The Plaintiffs' disadvantage arises from the boundary within the city in which they reside; therefore, the harm is not shared by all American people. The harm is not shared with other voters residing in other cities that did not accept the conditions from nongovernmental corporate entities. Any harm caused by the private funding is a product of each Plaintiff's residency affecting their right to vote. The Plaintiffs' harm caused by the Cities is thus distinguishable from voters from other places who don't suffer the harm.

It is immaterial that the use of the grants are non-partisan as the Cities assert.[24] Nor is the number of municipalities in Wisconsin that accepted the conditional grants, as the Defendant Cities assert, 111, of a possible 600.[25] The acceptance of the moneys came from a nongovernmental corporate entity with conditions. The undermining of the electoral process by layering additional conditions regarding the conduct of elections was the sole decision of the municipality accepting those conditions. The Defendant Cities do not challenge this fact.

Indeed, accepting moneys is only part of the whole. The accepted moneys were *conditional.* Hence, under what authority may a municipality accept nongovernmental

---

[23] Plts. Compl. ¶¶100–180.
[24] Defs. Jt. Memo. to Dismiss 4.
[25] https://www.lwm-info.org/590/Facts-About-Wisconsin-Municipalities (last visited Nov. 24, 2020).

corporate conditions in the conduct of federal elections?

The Voters Alliance alleges violations of the Elections Clause under Article 1, § 4, cl. 1, of the U.S. Constitution. "The Elections Clause has two functions. Upon the States it imposes the duty ("*shall* be prescribed") to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether."[26] Where Congress has not acted, the *states* may act as long as any state law is not contrary to federal law:

> The Clause's substantive scope is broad. "Times, Places, and Manner," we have written, are "comprehensive words," which "embrace authority to provide a complete code for congressional elections…" "In practice, the Clause functions as "a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Foster v. Love,* 522 U.S. 67, 69 (1997) (citation omitted). The power of Congress over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold,* 100 U.S. 371, 392 (1880).[27]

Municipalities in Wisconsin are not independent "states." Moreover, "municipalities have no authority but what they are given."[28] A search of Wisconsin election laws finds no law wherein a municipality is authorized to adopt nongovernmental corporate conditions of any kind for any kind of election—particularly federal election contests. It may be one thing

---

[26] *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1, 8 (2013) *citing U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 804–805 (1995); *id.,* at 862 (Thomas, J., dissenting).
[27] *Inter Tribal Council of Arizona, Inc.,* 570 U.S. at 9.
[28] *Wisconsin Carry, Inc. v. City of Madison,* 892 N.W.2d 233, 241 n16 (Wis. 2017) *citing Willow Creek Ranch, LLC v. Town of Shelby,* 2000 WI 56, ¶17, 235 Wis.2d 409, 611 N.W.2d 693 (*citing First Wis. Nat'l Bank of Milwaukee v. Town of Catawba*, 183 Wis. 220, 224, 197 N.W. 1013 (1924) ("Municipal bodies have only such powers as are expressly conferred upon them by the legislature or are necessarily implied from the powers conferred.")).

to suggest there is no Wisconsin law that prohibits the acceptance of private *moneys;* but, it is different when the Cities are accepting and adopting nongovernmental corporate conditions in the conduct of federal elections. That election authority is within the sole purview of the Wisconsin Legislature through the Elections Clause. It matters not as to what the conditions are, but the fact that privately-imposed conditions exist directly or indirectly relating to a federal election. Notably, here, the Cities are to *report back* to a nongovernmental corporate entity regarding the conduct of the federal election.[29] These legally-required reporting back actions are traceable to the Cities accepting the private federal election grants in the first place.

## II.     Declaratory judgment and injunctive relief will redress the Plaintiffs' injury.

As previously stated, the Cities' accepting moneys from a nongovernmental corporate entity included the Cities' acceptance of conditions in the conduct of federal elections. Certainly, the Voters Alliance alleged the Cities acted "ultra vires…without legal authority."[30]

As previously stated, there is no challenge that the nongovernmental corporate grants came with conditions. Further, there is no need to suggest a showing that the "conditions" affected the outcome of any one election, and as previously stated, there is no claim to election fraud. However, it is the Legislature that "has the power to regulate in ways that affect the mode and manner of conducting elections"[31] Nothing is found in federal or state law that gives that the same authority to a municipality.  No law supports a nongovernment

---

[29] Plts. Compl. ¶61. "How you spent the money" is how the government conducted the election.
[30] *Id., e.g.* ¶¶107, 117, 149, 173.
[31] *League of Women Voters of Wisconsin Educ. Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

8

Case 1:20-cv-01487-WCG   Filed 11/24/20   Page 8 of 11   Document 47

corporate entity dictating standards to Cities. Indeed, the municipalities acted without legal authority to give the nongovernment corporate entity that power.

Thus, although the relief sought includes an "injunction enjoining [the Defendant Cities] from accepting or using the CTCL's private federal election grants," there is nothing in the federal Declaratory Judgments Act that prohibits this Court to modify the injunctive relief requested to match the final adjudication of the underlying issues. For instance, while the Court may find the Cities' acceptance of the private moneys not contrary to federal or state law, but find the conditions are violative of municipal authority and the Elections Clause. In those circumstances, the injunctive relief would enjoin the Cities from adopting conditions of a nongovernmental corporate entity upon federal elections.

Regardless, "a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact.'"[32] Here, the declaratory and injunctive relief is proper and sufficient as it lies only within the boundaries of the Defendant Cities complained of—in each of the individual Plaintiff's city each reside in.

The Defendant Cities do not contest that if the Plaintiffs have standing, they may litigate their grievances as violative under the Elections Clause.[33]

### III. The Wisconsin Voters Alliance has standing.

Although the Defendant Cities did not directly challenge the Wisconsin Voters Alliance, as an association, lacking standing, the Voters Alliance asserts that it has associational standing. An organization may assert associational standing if: "(a) [the

---

[32] *Gill,* 138 S. Ct. at 1930 *quoting Lewis v. Casey,* 518 U.S. 343, 357 (1996).
[33] *See* Defs. Jt. Memo. to Dismiss 1–9.

9

Case 1:20-cv-01487-WCG   Filed 11/24/20   Page 9 of 11   Document 47

organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[34] The Voters Alliance has members as alleged.[35] These individuals would have standing to sue in their own right because allegations asserted as explained above affects those members within cities that adopted the nongovernmental corporate entity conditions, noting that the individual Plaintiffs are also members of the Voters Alliance.[36] The underlying action seeks to protect similarly situated Wisconsin voters. Moreover, the claims asserted and the relief requested do not require the participation of individual members.

Associational standing depends "in substantial measure on the nature of the relief sought."[37] Here, along with the individual Plaintiffs, the Voters Alliance seeks injunctive relief which will "inure to the benefit of the members actually injured and thus individualized proof of damages is often unnecessary."[38] And, as the Seventh Circuit recognized with respect to this final prong, there is no indication that "the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association."[39] Therefore, the Voters Alliance satisfies the requirements for associational standing.

---

[34] *Com. Cause Indiana v. Lawson,* 937 F.3d 944, 957 (7th Cir. 2019) (*quoting Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343(1977).
[35] Plts. Compl. ¶4.
[36] *Id.*
[37] *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 602 (7th Cir. 1993) (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).
[38] *Id.*
[39] *Id.*

## Conclusion

The Defendant Cities' motion to dismiss should be denied.

Dated: November 24, 2020  /s/ Erick G. Kaardal
Erick G. Kaardal, No. 1035141
Special Counsel for Amistad Project of
Thomas More Society
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Facsimile: 612-341-1076
Email: kaardal@mklaw.com
*Attorneys for Plaintiffs*